IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | EP-21-CR-1246-DB-1 |
| KIM DUNG THI LEE | § § | |

## MEMORANDUM OPINION AND ORDER

On this day, the Court considered its Opinion on Defendant Kim Dung Thi Lee's ("Ms. Lee") "Motion to Suppress" ("Motion") on remand. ECF Nos. 28, 52.

## BACKGROUND

On June 28, 2021, Border Patrol Agent Antolin Arguelles ("Agent Arguelles") observed Ms. Lee leaving a house which law enforcement believed—but Ms. Lee disputed—was a known "stash house" for smuggling undocumented noncitizens ("UNCs") and boarding a white Dodge Journey sport utility vehicle ("SUV"). Compl. 2, ECF No. 2; Mot. 1, ECF No. 20. Later, at a nearby gas station, Agent Arguelles observed the same SUV and "noticed that [its] rear suspension was heavily laden." Compl. 2, ECF No. 2. He followed the vehicle until it entered I-10 heading east, and he sent photographs and information about the vehicle including its license plate number to "other federal immigration law enforcement agents." *Id.* A Customs and Border Protection Intelligence Agent then disseminated this information to on-duty Border Patrol Agents ("BPA"), including Agent Pedro Gutierrez ("Agent Gutierrez"). *Id.*; Resp. 2, ECF No. 24.

As Agent Gutierrez approached the vehicle, he "noticed seven passengers hunched over in the rear of the vehicle." Resp. 2, ECF No. 24. Agent Gutierrez questioned the passengers, and they admitted they were not United States citizens and did not possess immigration documents.

*Id.* All occupants of the vehicle, including Ms. Lee, were taken to the Fort Hancock Border Patrol Station and detained overnight. Compl. 2, ECF No. 2.

The following morning, a Homeland Security Investigations ("HSI") Agent interviewed Ms. Lee. Resp. 3, ECF No. 24. Ms. Lee told the HSI Agent "she was aware she had UNCs in her vehicle," "was attempting to transport them to Dallas," and had $5,000 in her possession that "was a payment she recently received for previously smuggling UNCs." Compl. 3, ECF No. 2. Further, Ms. Lee "stated that she was fully responsible for this smuggling scheme." *Id.*

On October 1, 2021, Ms. Lee filed a Motion to Suppress the statements she made to the HSI Agent after what she alleged was an "illegal detention." Mot. 1, ECF No. 20. In that motion, Ms. Lee requested that the Court hold an evidentiary hearing "since the analysis in this case is very fact-specific." *Id.* at 3. On November 23, 2021, the Court denied both Ms. Lee's request for an evidentiary hearing and her Motion to Suppress. Op. 11, ECF No. 28. In denying the evidentiary hearing, the Court relied on its finding that "the parties do not dispute that a person was seen boarding [an] SUV at a *known stash house* for undocumented aliens." *Id.* at 5 (emphasis added).

Ms. Lee was sentenced following a stipulated bench trial where the Court found Ms. Lee guilty of transporting or attempting to transport UNCs within the United States and conspiring to do the same. ECF No. 38. Ms. Lee appealed this judgment. ECF No. 47. On March 20, 2023, the Fifth Circuit vacated and remanded the case back to this Court, based on the Court's decision not to hold an evidentiary hearing. J., ECF No. 52.

The Fifth Circuit noted that "key to [this Court's] decision [to deny the evidentiary hearing] was the fact that the 'parties do not dispute that a person was seen boarding the SUV at a

2

known stash house for undocumented aliens.' However, the briefs on the motion to suppress clearly establish a dispute on the nature of that location as a 'known stash house' and the underlying rationale for that designation." *Id.* at 4. The Fifth Circuit added that "a location's likelihood of criminality can factor into an officer's reasonable suspicion . . . but here, the Government provided no additional information regarding the location's status as a stash house. . . perhaps an affidavit from the off-duty agent who witnessed the location first-hand, or any number of hypothetical affidavits or reports, might have sufficiently bolstered the record to avoid an evidentiary hearing . . ." *Id.* at 5. (internal citations omitted).

On June 6, 2023, the Court held an evidentiary hearing where eyewitness Border Patrol Agents Antolin Arguelles and Pedro Gutierrez testified and were cross-examined by Ms. Lee's counsel. Min. Entry for Evid. Hr'g, ECF No. 54; Witness List by USA, ECF No. 55.

## LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" conducted by the Government. U.S. Const. amend. IV. "[W]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant." *Riley v. California*, 573 U.S. 373, 382 (2014) (internal citations omitted). However, in the absence of a warrant, a search may still be "reasonable . . . if it falls within a specific exception to the warrant requirement." *Id.*

*Terry v. Ohio* provides one such exception, holding that "in appropriate circumstances the Fourth Amendment allows a properly limited 'search' or 'seizure' on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (discussing *Terry v. Ohio*, 392 U.S. 1 (1968)).

3

The court extended this logic to certain types of immigration stops due to the "large government interest . . . minimal intrusion . . . and absence of practical alternatives for policing the border." *Id.* The court has held that when an officer reasonably suspects "that a particular vehicle may contain aliens who are illegally in the country" he may briefly stop the car. *Id.*

*Terry* stops do not require that the officer show probable cause but instead the "less demanding" reasonable suspicion standard. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). An officer can show reasonable suspicion by "point[ing] to specific and articulable facts which, taken together with rational inferences from those facts," suggest that "criminal activity may be afoot." *Terry*, 392 U.S. at 21, 30.

Evidence obtained in violation of the Fourth Amendment must be suppressed and cannot be used at trial. *See Mapp v. Ohio*, 367 U.S. 643, 657 (1961) (explaining that the exclusionary rule requires "that no man . . . be convicted on unconstitutional evidence"); *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014) ("Evidence that was obtained . . .[in] violation of the Fourth Amendment will be suppressed and excluded from consideration."). A defendant who seeks to suppress illegally obtained evidence must do so before trial. Fed. R. Crim. P. 12(b)(3)(C). Normally, the defendant bears the burden of proving by a preponderance of the evidence that the evidence in question was obtained in violation of his rights. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). However, when law enforcement acts without a warrant, "the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (quoting *United States v. Castro*, 166 F.3d 728, 73 n.7 (5th Cir. 1999)).

"An evidentiary hearing is required on a motion to suppress only when necessary to receive evidence on an issue of fact." *United States v. Harrelson*, 705 F.2d 733, 737 (1983).

4

"Evidentiary hearings are not granted as a matter of course; such a hearing is required only if any disputed material facts are 'necessary to the decision of the motion.'" *United States v. Dean*, 100 F. 3d 19, 21 (5th Cir. 1996) (citing *Id.*). If the defense alleges that there are disputed facts, its "motion must be 'sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented.'" *Id.* (quoting *Harrelson*, 705 F.2d at 737).

## ANALYSIS

The Fifth Circuit found that by arguing that the house where the white SUV was initially spotted was a *suspected* stash house and not a *known* stash house, "[that] aspect of the record was adequately disputed . . ." J. 4, ECF No. 52. The Fifth Circuit remanded the case to this Court for an evidentiary hearing because Lee "alleged 'sufficient facts which, if proven, would justify relief,' and the existing record renders it 'necessary [for the court] to receive evidence on [the] issue of fact.'" J. 5, ECF No. 52 (quoting *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983).

On June 6, 2023, the Court held a suppression hearing on the stash house issue. Min. Entry for Evid. Hr'g, ECF No. 54. At that hearing, the two Border Patrol Agents who observed the white SUV, Agents Arguelles and Gutierrez, testified. Min. Entry for Evid. Hr'g, ECF No. 54; Witness List by USA, ECF No. 55. The Court accepted both agents' testimony. Min. Entry for Evid. Hr'g, ECF No. 54. Based on Agent Arguelles's testimony, the Court finds that the location of the vehicle at a house with both past ties and suspected present ties to smuggling, the way the vehicle was positioned on the curb, the fact that Ms. Lee was observed loading the vehicle, and the heavily laden suspension—taken together with Agent Gutierrez's later observations—support a finding of reasonable suspicion.

1. **The Court Finds Both Agents Credible.**

To evaluate a witness's credibility, the Fifth Circuit advises the factfinder to consider the "believability" of each witness. District Judges Association Fifth Circuit, *Pattern Jury Instructions (Criminal Cases)*, 1.09 Credibility of Witness (2019).

The Court found the agents' testimony believable because the agents provided specific information about what they observed, and they admitted when they did not remember or did not know the answer to a question. Thus, the Court accepts their testimony as credible.

### 2. Agent Arguelles's Observations of the White SUV.

#### a. The residence was previously used as a "stash house," and agents suspected it was currently being used as a "stash house."

Agent Arguelles was the first officer to surveil the white SUV on the night of June 28, 2021. While on his way home, he passed by a pink mobile home in Clint, Texas, that law enforcement agencies were actively monitoring and noticed a white SUV parked outside. Min. Entry for Evid. Hr'g, ECF No. 54. During the hearing, Agent Arguelles testified that smugglers had previously used the pink mobile home as a stash house. *Id.* Officers executed a search warrant on the house in 2018 as part of their investigation into its use as a stash house. *Id.* Further, according to Agent Arguelles, agents had apprehended the owner of the mobile home for alien smuggling prior to June 2021. *Id.* The past smuggling activity in this neighborhood, and at this home in particular, indicates that this is a "high crime" area, which is a relevant contextual considerations in a *Terry* analysis. *Wardlow*, 528 U.S. at 124. Arguelles also testified that more recently (in the thirty to forty-five days prior to the stop), neighbors and other law enforcement agencies had reported information about possible illegal aliens being harbored at that home. Min. Entry for Evid. Hr'g, ECF No. 54.

Ms. Lee argues that Mr. Arguelles's testimony does not establish that the home being observed was a known stash house. *Id.* She points to the fact that Agent Arguelles was

unable to provide details about who the tips came from—other than to say they came from neighbors—or the quality of the information. *Id.* Because of this, she posits, there was no way for the Court to evaluate whether the tips were reliable. *Id.* She argues that this taints all further observations, relegating the stop to being based on "suspicion upon suspicion." *Id.*

Ms. Lee's argument would be stronger if the tips were the only information Agent Arguelles relied on when passing the information along for further investigation. However, it was not. Agent Arguelles's observations at the house, and later at a nearby gas station, buttressed his belief that Ms. Lee was engaging in criminal activity.

### b. Agent Arguelles's observations at the house

As Agent Arguelles observed the white SUV from his parked car, he noted that it was parked in reverse, with the back half of the vehicle on the property and the front half of the vehicle on the sidewalk. *Id.* Agent Arguelles found this significant because, based on his experience investigating alien smuggling, drivers purposefully park this way to load subjects into the vehicle quickly and drive off. *Id.*

While Agent Arguelles was parked, he observed two individuals in the front of the vehicle. *Id.* After a while, he saw a third person board the vehicle. *Id.* At this point, Agent Arguelles drove to a nearby gas station to put gas in his personal vehicle because he did not want to be more involved with surveillance of the van. *Id.*

By chance, Agent Arguelles would spot the white SUV once more that night.

### c. Agent Arguelles's observations at the gas station

While Agent Arguelles was filling his car with gas, he noticed the white SUV pull into the same station. *Id.* At that time, Agent Arguelles observed that the suspension of the car was dramatically low, which led him to believe that the number of people in the SUV exceeded

7

the vehicle's weight limitation. *Id.* He saw a woman emerge from the front passenger side and fill the car with gas. *Id.* He then saw the car leave the gas station, heading east. *Id.* The fact that the car was driving east was significant to Agent Arguelles because, at that time, the Sierra Blanca Border Patrol checkpoint—east of the gas station—was closed and not performing inspections. *Id.*

### d. Agent Arguelles's observations, both at the house and at the gas station, contribute to a finding of reasonable suspicion.

Suspicion is reasonable when an officer can "point to specific and articulable facts which, taken together with rational inferences from those facts," suggest that "criminal activity may be afoot." *Terry*, 392 U.S. at 21, 30. Here, Agent Arguelles can point to a number of specific facts which indicated that criminal activity was afoot: (1) he saw the SUV parked at a house with past and suspected present ties to alien smuggling; (2) the car was parked in a manner that is commonly used by smugglers; (3) he saw the vehicle minutes later at a gas station and observed the suspension was low, indicating that the car was overcapacity; and (4) the car was heading east towards a checkpoint that was not performing inspections.

Ms. Lee argues that "[w]ithout the information that the house was a 'known stash house,' the totality of the information would not amount to reasonable suspicion." Br. 2, ECF No. 58. "Without the supposed 'known stash house' component, the evidence was that the van picked up a person at a home, looked somewhat heavily loaded, and later headed towards I-10 east." *Id.* However, Agent Arguelles's testimony establishes that law enforcement agencies had reason to believe the home where the SUV was parked was historically and recently used for alien smuggling. Min. Entry for Evid. Hr'g, ECF No. 54. Ms. Lee's re-telling of the facts also ignores the way the SUV was parked and that it was headed towards a closed checkpoint. *See id.* Taking these facts together, the "totality of the circumstances" supports a finding of reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see Brignoni-Ponce*, 422 U.S. at 884–86

8

(Factors that may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area include "proximity to the border, the usual patterns of traffic . . . previous experience with alien traffic . . . information about recent illegal border crossings . . . and aspects of the vehicle itself.").

Furthermore, the manner in which Agent Arguelles discovered the information undercuts Ms. Lee's arguments about Agent Arguelles's findings being based on "suspicion upon suspicion." Importantly, Agent Arguelles did not report his suspicions about the white SUV after leaving the house. Min. Entry for Evid. Hr'g, ECF No. 54. It was not until Agent Arguelles independently saw the SUV at the gas station, noted the low suspension, and noticed that it was traveling east towards a closed checkpoint that he shared his suspicions with other officers. *Id.* Thus, Agent Arguelles was not chasing a tenuous lead. Rather, he happened upon additional information that precipitated his decision to notify other officers about the white SUV.

### 2. Agent Gutierrez's Observations of the SUV.

Still, the question is not whether there was reasonable suspicion at this point because Agent Arguelles did not stop the vehicle. Instead, the relevant inquiry is whether Agent Gutierrez had reasonable suspicion because he was the officer who stopped the vehicle.

After observing the white SUV head towards the closed checkpoint, Agent Arguelles relayed the information to other federal agents. Min. Entry for Evid. Hr'g, ECF No. 54. That information was dispatched to Agent Gutierrez. *Id.* Agent Gutierrez then parked on the side of I-10 east and watched for a white Dodge Journey SUV. *Id.* No more than 30 minutes later, Agent Gutierrez saw the white SUV drive by and followed it. *Id.* While following the vehicle, he noted the suspension was low and he noticed movement inside the vehicle. *Id.* According to

9

Agent Gutierrez, it looked like there were an excessive number of people inside the vehicle relative to its size. *Id.*

Under the "collective knowledge doctrine," the information disseminated through Border Patrol's intel system can establish reasonable suspicion justifying Agent Gutierrez's stop of the vehicle. See *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) (quoting *United States v. Hensley*, 469 U.S. 221, 682 (1985)) ("[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop . . ." ).

The collective knowledge doctrine applies as long as there is "'some degree of communication' between the acting officer and the officer who ha[d] knowledge of the necessary facts." United States v. *Bass*, 996 F.3d 729, 737 (5th Cir. 2021); *see also Ibarra-Sanchez*, 199 F.3d at 759. As *Bass* and *Ibarra-Sanchez* indicate, the communication need not be direct to transfer reasonable suspicion. *Id.*; *see also United States v. McPherson*, 630 F. App'x. 330, 332 (5th Cir. 2016). Rather, the information can be called in to a central station and further disseminated to on-duty officers. *See Bass*, 996 F.3d at 737; *Ibarra-Sanchez*, 199 F.3d at 757. In Ms. Lee's case, Agent Gutierrez received information through a Customs and Border Intel Agent who dispatched the information. Compl. 2, ECF No. 2; Resp. 2, ECF No. 24. Thus, the collective knowledge doctrine applies, supporting the conclusion that Agent Gutierrez's stop was based on "reasonable suspicion."

## CONCLUSION

On remand, this Court is tasked with collecting evidence about whether the home Ms. Lee exited before boarding the white SUV was a known stash house. The Court held an evidentiary hearing where Agent Arguelles testified that (1) the home had previously been

investigated for alien smuggling; (2) the owner of the home was apprehended for smuggling; and (3) the house was actively being investigated for smuggling in June of 2021. The Court finds that this evidence, along with Agents Arguelles and Gutierrez's later observations, provides "specific and articulable facts which, taken together with rational inferences from those facts," suggested that "criminal activity [was] afoot." *Terry*, 392 U.S. at 21, 30. Therefore, Agent Gutierrez's stop was based on reasonable suspicion and thus constitutional and Ms. Lee's motion to suppress will be denied.

Accordingly, **IT IS HEREBY ORDERED** that Defendant Kim Dung Thi Lee's "Motion to Suppress" is **DENIED**.

SIGNED this 20th day of **July 2023**.

_____
THE HONORABLE DAVID BRIONES
SENIOR UNITED STATES DISTRICT JUDGE

11